UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 7 2000

JAMES W. McCORMACK, CLERK
By: _____
DEPUTY CLERK

FRANK STEVENSON and REBECCA HARSHBERGER,
ADMINISTRATRIX OF THE ESTATE OF
MARY E. STEVENSON, DECEASED                                          PLAINTIFFS

VS.                              NO. H-C-99-160

UNION PACIFIC RAILROAD COMPANY and
OPERATION LIFESAVER, INC.                                            DEFENDANTS

## PLAINTIFF'S SECOND AMENDMENT TO COMPLAINT

Come the Plaintiffs Frank Stevenson and Rebecca Harshberger, as Administratrix of the Estate of Mary E. Stevenson, Deceased, by their attorneys, Easley, Hicky & Hudson, and for their cause of action against the Defendant, state:

### Jurisdictional Statement

1. That Plaintiff Frank Stevenson and decedent Mary Stevenson were man and wife, and at the time of the collision complained of herein were adult residents of Cross County, Arkansas. The Estate of Mary Stevenson is now pending in the Probate Court of Cross County, Arkansas. The Defendant Union Pacific Railroad Company, hereinafter called "Union Pacific", is and was at all times pertinent hereto a foreign corporation organized under the laws of the State of Utah and qualified to do business in the State of Arkansas. The Defendant Operation Lifesaver Incorporated, hereinafter called "OLI", is and was at all times pertinent hereto a foreign corporation organized under the laws of the District of Columbia

37

and doing business in the State of Arkansas. The collision complained of herein occurred in Cross County, Arkansas. There exists complete diversity of citizenship, and the matter in controversy exceeds $75,000.00. Jurisdiction of this Court is invoked pursuant to 28 USC Section 1332.

## Facts and Fault Allegations

2. On or about November 6, 1998, Plaintiff Frank Stevenson was driving his vehicle, a 1988 Nissan Pulsar lawfully and cautiously westbound on State Highway No. 364 approximately 1/10th of a mile east of State Highway No. 1 in Vanndale, Cross County, Arkansas. His wife, Mary E. Stevenson was a passenger in the right front seat. Plaintiff was attempting to cross the Union Pacific railroad track, when, without any warning, the Plaintiff's vehicle was smashed and obliterated by Defendant's freight train, traveling southbound. The train that struck Plaintiffs was owned and operated by Defendant Union Pacific. Operation Lifesaver was originated by the Union Pacific Railroad as a railroad crossing educational and safety program. The Union Pacific Railroad continues to use the OLI "educational and safety program" in a joint venture designed to mislead the public, railroad employees and the transportation industry concerning railroad safety practices.

3. The collision and resulting damages to Plaintiffs were directly and proximately caused by the conduct of Defendants and/or their agents, servants and employees, while acting in the scope of their employment. Defendants' conduct constitutes negligent, willful and wanton conduct, and reckless disregard for the safety of plaintiffs and the public in that:

### A. As to audible warning systems:

(1) The train horn was not properly blown to warn of the train's approach to the railroad crossing. The sound from the horn if blown at all was not audible to Plaintiff.

(2) The minimum sound output on the horn is mandated by federal law, but Defendant railroad has uniformly failed to insure that such a sound output on its horns comply with this minimum standard. In keeping with this practice Defendant railroad did nothing to insure compliance with the standard prior to this accident.

(3) Defendants have actual or constructive knowledge that horn violations are common and widespread. Defendant railroad has chosen not to monitor, investigate or punish whistle violations, including insufficient horn activation (soft whistle), improper activation and failure to activate the horn, and Defendant railroad has failed to accurately document these violations. Instead, Defendants have elected to condone the pattern and practice of whistle violations by fraudulently reporting compliance to the Federal Railroad Administration, law enforcement and the public.

(4) Defendants have known the inherent problems with train mounted audible warning systems for over 25 years and done nothing to resolve those problems or otherwise compensate for the safety deficiencies caused by those problems. Instead, Defendants have intentionally elected to engage in an information campaign designed to obscure the truth. Through the use of this campaign defendant railroad has failed to properly instruct its employees about train mounted audible warning systems and the inherent safety deficiencies associated with various applications of these devices.

(5) No bell was sounded, as required by ACA Section 23-12-410.

## B. As to Maintenance:

(1) Defendant railroad failed to maintain its track, railroad crossings and right of way in a safe and reasonable condition in violation of Arkansas and Federal law. Non-compliant track conditions were ignored and misreported.

(2) The railroad crossing was not adequately and properly marked pursuant to the MUTCD, and the non- compliant conditions were ignored and misreported

(3) The railroad crossing was not properly constructed to allow safe passage for the motoring public.

(4) The railroad right-of-way was not adequately clear of brush, trees, debris and other visual obstructions. In addition, the sight triangles necessary for a safe approach were not adequately clear of brush, trees, debris and other visual obstructions. These obstructions to visibility have been ignored by the railroad and intentionally misreported to the Federal Railroad Administration.

(5) Defendant railroad entrusted the maintenance of the railroad crossing to individuals when it knew, or should have known, said individuals were not properly instructed on issues of safety for the motoring public. The crossing in question is within a corridor where the pattern and practice of the railroad has been to totally ignore public safety. Defendant UP's education program through Operation Lifesaver, Inc.

(6) promotes the practice of ignoring the railroads' public safety duties.
(6) Required inspections of track and crossings were not performed, misreported and repeatedly failed to identify obvious non-compliant conditions.

### C. As to improper instruction and management:

(1) Defendant railroad entrusted the train in question to the train crew when it knew, or should have known, that said train crew was not properly instructed on issues of safety for the motoring public. Defendant has failed to instruct crews and other employees on proper reporting of hazards to the motoring public and appropriate operating practices for these hazards. Defendant railroad's practices discourage the reporting of crossing safety hazards.
(2) Defendant railroad has negligently failed to identify specific local hazards and failed to instruct its train crews and other employees how to identify specific local hazards.
(3) Defendants have intentionally instructed train crews and other employees that there is nothing the railroad can do to prevent accidents or reduce risks to the motoring public at railroad crossings despite the knowledge that such an assertion is false.
(4) Defendant railroad has failed to work jointly with local road authorities and adjoining landowners to provide adequate and safe crossings for the motoring public.
(5) Defendant railroad has failed to perform any proficiency tests concerning public safety at crossings.
(6) Defendant railroad knew, or should have known, that the custom and practice of failing to supervise and monitor the safety practices of its train crews, maintenance of way crews and supervisors of those crews, and further failing to implement policies and procedures which would better insure the safety of the motoring public, would result in needless catastrophic injury and loss of life.

### D. As to speed and braking:

(1) The lead locomotive did not have an in service data event recorder. This condition required the train speed to be maintained at or under 30 mph. Accordingly, the train was exceeding the speed authorized under federal law.
(2) The train failed to slow and/or brake in sufficient time to avoid the collision.
(3) The train also failed to slow or to prepare for braking despite the existence of known specific local hazards. These hazards include all the conditions and practices created by Defendant railroad as identified herein.
(4) Defendant railroad failed to issue an appropriate slow order.

### E. As to the ultra-hazardous crossing:

(1) The railroad crossing where this accident occurred is an ultra-hazardous or unreasonably dangerous crossing. Defendant railroad knew, or should have known, the ultra-hazardous nature of this crossing. This ultra-hazardous or unreasonably dangerous crossing is a railroad crossing that meets the conditions of 23 C.F.R. 646.214(b)(3); and therefore requires the installation of adequate warning devices including lights and gates.

(2) It appears that federal safety funds were used at this crossing to install one crossbuck. The use of federal funds at this ultra-hazardous crossing without bringing the crossing into compliance with 23 C.F.R. 646.214 constitutes a violation of the MUTCD, Arkansas law and the contract Defendant railroad had with the State of Arkansas. Those funds were wrongfully used in violation of 23 U.S.C. 109(e); 23 U.S.C. 139(d); 45 U.S.C. 434; and 23 C.F.R. 646.214

(3) Knowing the requirements of Arkansas law and 23 C.F.R. 646.214, Defendant railroad elected to voluntarily engage in the evaluation of crossings for the expenditure of federal funds. The State of Arkansas relied upon Defendant railroad to perform a proper evaluation of crossings and make appropriate reports of crossing conditions. Instead of fulfilling these duties, Defendant railroad has routinely misreported and ignored safety problems of crossings. In keeping with its own pattern and practice Defendant railroad did not make appropriate reports of known hazardous conditions at the crossing where plaintiffs' accident occurred.

(4) Defendant railroad misreported or ignored the true nature of this crossing and others in the immediate vicinity, thereby adversely affecting the prospect of funding for installation of adequate warning devices.

(5) Defendant railroad has elected to totally ignore its joint obligations concerning crossing safety by failing to evaluate the crossing and work with local highway authorities to improve the safety of the crossing. Instead, Defendant railroad has taken an adversarial position requiring local authorities to fight against the railroad to obtain public safety accommodation. Defendant railroad has elected to ignore the specific local hazards of small towns with limited resources and only cooperate with larger cities that have the power and resources to do battle with Defendant railroad.

(6) Defendant railroad has intentionally refused to evaluate grade crossings to provide reasonable information necessary to establish the need for additional warning devices. Instead, Defendant railroad's efforts to obtain public funding are directed by the motivation of increasing profits, supplementing its own maintenance budget and creating the affirmative defenses of federal preemption, all at the cost of public safety.

(7) Defendants have instructed railroad employees, the public, and transportation officials in such a manner as to create a belief that the railroad has absolutely no duty to provide safe and adequate crossings for the motoring public.

(8) Defendants have known for years that lights and gates are affordable, cost effective guarding devices that have proven to be 90% effective in reducing accidents at grade

crossings. Despite this knowledge Defendants have intentionally misrepresented the effectiveness of these guarding devices and have engaged in conduct designed to limit the installation of these devices. The culture created by the Defendants' crossing safety policies has the effect of increasing risk to the motoring public, including these Plaintiffs.

## Violation of Federal Regulations and Railroad Rules

4. The following regulatory provisions establish minimum requirements for operations and practices of defendant railroads at all times relevant herein:

   (a) Title 49 of the Code of Federal Regulations, Part 217; governing railroad operation rules,
   (b) Title 49 of the Code of Federal Regulations, Part 218; governing railroad operation practices,
   (c) Title 49 of the Code of Federal Regulations, Part 220; governing railroad radio standards and procedures,
   (d) Title 49 of the Code of Federal Regulations, Part 225; governing railroad accident investigations and reporting,
   (e) Title 49 of the Code of Federal Regulations, Part 228; governing railroad employee's hours of service,
   (f) Title 49 of the Code of Federal Regulations, Part 229; governing railroad locomotive safety standards,
   (g) Title 49 of the Code of Federal Regulations, Part 233; governing railroad signal systems reporting requirements,
   (h) Title 49 of the Code of Federal Regulations, Part 234; governing railroad grade crossing signal system safety,
   (i) Title 49 of the Code of Federal Regulations, Part 236; governing railroad rules, standards and instructions for installation, inspection, maintenance and repair of systems, devices and appliances,
   (j) Title 23 of the Code of Federal Regulations, Part 646; governing railroad-highway crossings projects, and
   (k) Other related provisions in the Code of Federal Regulations, and in addition thereto
   (l) The enabling legislation for each of the above regulations.

5. Pursuant to the above regulations defendant railroad has adopted rules governing its own practices and operations. The following rules, adopted by defendant railroad, must meet the minimum requirements of the federal regulations mandating their adoption but may prescribe

additional or more stringent requirements:

   (a) Train Dispatcher Rules,
   (b) General Code of Operating Rules,
   (c) Radio Rules,
   (d) Safety Rules,
   (e) Air Brake and Train Handling Rules,
   (f) Maintenance-of-way Rules,
   (g) Timetables,
   (h) Special instructions, and
   (i) Other Rules, Orders and Instructions.

6. Defendant railroad has violated the above rules and regulations governing their own practices and operations. Violation of its own rules and federal regulations are evidence of negligent, willful and wanton conduct.

## Operation Lifesaver

7. The "Operation Lifesaver" campaign is a public relations program created by the Union Pacific Railroad in 1972 to serve the following special interests of the railroad:

   (a) To deny and minimize the railroad's responsibility for crossing accidents,
   (b) To blame the motorist for virtually all crossing accidents,
   (c) To disseminate false and misleading information about the effectiveness of lights and gates as crossing protection devices,
   (d) To disseminate false and misleading information about the railroad's public safety responsibilities at railroad crossings,
   (e) To indoctrinate railroad employees with a belief system that wrongfully incorporates the above mentioned mis-information into railroad culture, and pits that culture against the average motorists,
   (f) To influence police with false and misleading information that serves only the special interest of the railroad industry,
   (g) To influence government agencies and employees with false and misleading information that serves only the special interest of the railroad industry,
   (h) To stereotype motorists involved in crossing accidents as unreasonable risk-taking drivers, and to promote the concept that the railroads are victims of these accidents,
   (i) To influence the media with false and misleading information that serves only the special interest of the railroad industry, and
   (j) To actively influence the police and media response to individual crossing accidents.

8. Operation Lifesaver, Inc. has been fraudulently and wrongfully incorporated as a 501(c)(3), "non–profit" corporation designed to serve all the above referenced special interests of the railroad industry, including the defendant railroad. In violation of it's tax exempt status, OLI, together with defendant railroad have done the following:

    (a) Misrepresented this railroad's public relations campaign as a safety and education program,
    (b) Attempted to obscure the fact that Operation Lifesaver is a railroad program by misrepresenting it as a grassroots safety program,
    (c) Wrongfully obtained tax free donations and federal funds to serve the special interests of the railroad industry, including defendant railroad,
    (d) Wrongfully used OLI's tax exempt status to lobby for the special interests of the railroad industry, and
    (e) Wrongfully used OLI's tax exempt status to influence the media, law enforcement, government agencies and government employees.

9. Defendant railroad has utilized OLI to provide false and misleading information to plaintiff, railroad employees, the public, governmental agencies and government employees, all of whose reliance on the information contributed to the fatal collision and injuries in this case.

## Violation of an Assumed Duty Under Second Restatement of Torts § 324A.

10. Defendants have gratuitously taken upon themselves the dissemination of information related to railroad crossing safety to include the representation that lights and gates at crossings are not effective safety devices. These representations were made without regard to the exercise of reasonable care by the defendants and with the intention of having others rely upon the representations. These representations resulted in an increased risk of harm to Plaintiffs and contributed to the accident herein. Defendants' election to delay and obstruct the federal

funding of installation of lights and gates has resulted in a reduced number of guarded crossings being funded, and prevented the upgrading of the crossing in question prior to the collision which took the life of Mary Stevenson, and injured Frank Stevenson.

11. Defendants have gratuitously taken upon themselves the dissemination false and misleading information to the public, railroad employees and government officials, all as more specifically set forth herein. These representations have created a railroad culture that jeopardizes crossing safety and creates a false set of expectancies in reasonable motorists; all resulting in an increased risk of harm to plaintiffs

## Fraud and Estoppel

12. Defendant railroad and OLI have falsely represented the effectiveness of lights in gates at railroad grade crossings, in an effort to give the impression that lights and gates are not effective safety devices. Defendants know that these representations are false and misleading or, that Defendants lack a sufficient basis of information to make such statements. By their actions, defendants have sought to induce reliance by the public and government. Reliance upon these false and misleading representations has contributed to the reduction in the number of lights and gates installations in Arkansas.

13. OLI has received federal funds to promote railroad crossing education and safety. These funds have been misused to promote the special interest of railroads and to lobby for railroad interests. OLI has fraudulently obtained not-for-profit status to promote and lobby for railroad interests. Defendants' have jointly used federal funds and tax advantages to reduce

and obstruct the installation of lights and gates and to misrepresent relevant information to the public, railroad employees and government officials, all as more specifically set forth herein.

14. Plaintiffs were injured by the conduct of the defendants due to the reduced number of lights and gates installed, an unsafe railroad environment and culture, and, by relying upon false expectances created by defendants.

15. Defendants should be estopped from claiming federal preemption as a defense to the adequacy of the warning devices at this crossing. Wrongful manipulation of federal funding programs that was adopted for the purpose of public safety should estop Defendants from asserting any defenses derived from their own wrongful conduct.

## Spoliation of Evidence

16. Defendant railroad has engaged in a pattern and practice of hiding and destroying evidence with the intent of preventing its use in litigation. In keeping with its pattern and practice, defendant railroad has destroyed relevant evidence in this case and obstructed plaintiffs' access to other relevant evidence. The railroad's destruction and obstruction of access to relevant evidence has prevented plaintiffs form access to a full and fair trial based upon the complete truth.

## Punitive Damages

17. Punitive damages should be assessed against the Defendants, in an amount to be fixed by the jury, for intentional, willful, wanton conduct, and reckless disregard for the safety of the Plaintiffs, and the public.

**WHEREFORE**, Plaintiffs pray that in addition to their claims for compensatory damages set out in their original complaint, that Defendants be punished for their willful and wanton conduct, and reckless disregard for the safety of the Plaintiffs and the public, by the assessment of punitive damages in an amount to be set by the jury; and for all other proper relief.

EASLEY, HICKY & HUDSON
Attorneys for Plaintiffs

By: */s/ B. Michael Easley*
B. Michael Easley (74041)
Post Office Box 1115
Forrest City, Arkansas 72336-1115
(870) 633-1447

## CERTIFICATE OF SERVICE

I, B. MICHAEL EASLEY, attorney for the Plaintiffs in this cause, do hereby certify that I have served a copy of the above and foregoing pleading upon Mr. Scott H. Tucker, Attorney at Law, at his address at 2000 Regions Center, 400 West Capitol Avenue, Little Rock, AR 72201-3493 by posting a copy via regular U.S. Mail with sufficient postage thereon this 4th day of August, 2000.

_____
B. Michael Easley