UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
JAN 10 2001
JAMES W. McCORMACK, CLERK
By: _____ DEP. CLERK

FRANK STEVENSON and REBECCA HARSHBERGER,
ADMINISTRATRIX OF THE ESTATE OF
MARY E. STEVENSON, DECEASED                                    PLAINTIFFS

VS.   NO. H-C-99-160

UNION PACIFIC RAILROAD COMPANY                                  DEFENDANT

## AMENDED COMPLAINT
## [THIRD SUPPLEMENTED]

Come the Plaintiffs, Frank Stevenson and Rebecca Harshberger, as Administratrix of the Estate of Mary E. Stevenson, Deceased, and for their cause of action against Defendants, state:

### JURISDICTIONAL STATEMENT

1. That Plaintiff Frank Stevenson and decedent Mary Stevenson were man and wife, and at the time of the collision complained of herein were adult residents of Cross County, Arkansas. The Estate of Mary Stevenson is now pending in the Probate Court of Cross County, Arkansas. The Defendant Union Pacific Railroad Company, hereinafter called "Union Pacific", is and was at all times pertinent hereto a foreign corporation organized under the laws of the State


105

of Utah and qualified to do business in the State of Arkansas. The Defendant Operation Lifesaver Incorporated, hereinafter called "OLI", is and was at all times pertinent hereto a foreign corporation organized under the laws of the District of Columbia and doing business in the State of Arkansas. The collision complained of herein occurred in Cross County, Arkansas. There exists complete diversity of citizenship, and the matter in controversy exceeds $75,000.00. Jurisdiction of this Court is invoked pursuant to 28 USC Section 1332.

## FACTS AND FAULT ALLEGATIONS

2.  On or about November 6, 1998, Plaintiff Frank Stevenson was driving his vehicle, a 1988 Nissan Pulsar lawfully and cautiously westbound on State Highway No. 364 approximately 1/10th of a mile east of State Highway No. 1 in Vanndale, Cross County, Arkansas. His wife, Mary E. Stevenson was a passenger in the right front seat. Plaintiff was attempting to cross the Union Pacific railroad track, when, without any warning, the Plaintiff's vehicle was smashed and obliterated by Defendant's freight train, traveling southbound. The train that struck Plaintiffs was owned and operated by Defendant Union Pacific. Operation Lifesaver was originated by the Union Pacific Railroad as a railroad crossing educational and safety program. The Union Pacific Railroad continues to use the OLI "educational and safety program" in a joint venture designed to mislead the

public, railroad employees and the transportation industry concerning railroad safety practices.

3. The collision and resulting damages to Plaintiffs were directly and proximately caused by the conduct of Defendants and/or their agents, servants and employees, while acting in the scope of their employment. Defendant's conduct constitutes negligent, willful and wanton conduct, and reckless disregard for the safety of plaintiffs and the public in that:

### A. As to audible warning systems:

(1) The train horn was not properly blown to warn of the train's approach to the railroad crossing. The sound from the horn if blown at all was not audible to Plaintiff.

(2) The minimum sound output on the horn is mandated by federal law, but Defendant railroad has uniformly failed to insure that such a sound output on its horns comply with this minimum standard. In keeping with this practice Defendant railroad did nothing to insure compliance with the standard prior to this accident.

(3) Defendants have actual or constructive knowledge that horn violations are common and widespread. Defendant railroad has chosen not to monitor, investigate or punish whistle violations, including insufficient horn activation (soft whistle), improper activation and failure to activate the horn, and Defendant railroad has failed to accurately document these violations. Instead, Defendants have elected to condone the pattern and practice of whistle violations by fraudulently reporting compliance to the Federal Railroad Administration, law enforcement and the public.

(4) Defendants have known the inherent problems with train mounted audible warning systems for over 25 years and done nothing to resolve those problems or otherwise compensate for the safety deficiencies caused by those problems. Instead, Defendants have

intentionally elected to engage in an information campaign designed to obscure the truth. Through the use of this campaign defendant railroad has failed to properly instruct its employees about train mounted audible warning systems and the inherent safety deficiencies associated with various applications of these devices.

(5) No bell was sounded, as required by ACA Section 23-12-4 10.

### B. As to maintenance:

(1) Defendant railroad failed to maintain its track, railroad crossings and right of way in a safe and reasonable condition in violation of Arkansas and Federal law. Non-compliant track conditions were ignored and misreported.

(2) The railroad crossing was not adequately and properly marked pursuant to the MUTCD, but the non-compliant conditions were ignored and misreported.

(3) The railroad crossing was not properly constructed to allow safe passage for the motoring public.

(4) The railroad right-of-way was not adequately clear of brush, trees, debris and other visual obstructions. In addition, the sight triangles necessary for a safe approach were not adequately clear of brush, trees, debris and other visual obstructions. These obstructions to visibility have been ignored by the railroad and intentionally misreported to the Federal Railroad Administration.

(5) Defendant railroad entrusted the maintenance of the railroad crossing to individuals when it knew, or should have known, said individuals were not properly instructed on issues of safety for the motoring public. The crossing in question is within a corridor where the pattern and practice of the railroad has been to totally ignore public safety. Defendants' education program promotes the practice of ignoring the railroads' public safety duties.

(6) Required inspections of track and crossings were not performed, misreported and repeatedly failed to identify obvious non-compliant conditions.

### C. As to improper instruction and management:

(1) Defendant railroad entrusted the train in question to the train crew when it knew, or should have known, that said train crew was not properly instructed on issues of safety for the motoring public. Defendant has failed to instruct crews and other employees on proper reporting of hazards to the motoring public and appropriate operating practices for these hazards. Defendant railroad's practices discourage the reporting of crossing safety hazards.

(2) Defendant railroad has negligently failed to identify specific local hazards and failed to instruct its train crews and other employees how to identify specific local hazards.

(3) Defendants have intentionally instructed train crews and other employees that there is nothing the railroad can do to prevent accidents or reduce risks to the motoring public at railroad crossings despite the knowledge that such an assertion is false. Defendants' education program promotes the practice of ignoring the railroads' public safety duties.

(4) Defendant railroad has failed to work jointly with local road authorities and adjoining landowners to provide adequate and safe crossings for the motoring public.

(5) Defendant railroad has failed to perform any proficiency tests concerning public safety at crossings.

(6) Defendant railroad knew, or should have known, that the custom and practice of failing to supervise and monitor the safety practices of its train crews, maintenance of way crews and supervisors of those crews, and further failing to implement policies and procedures which would better insure the safety of the motoring public, would result in needless catastrophic injury and loss of life.

### D. As to speed and braking:

(1) The lead locomotive did not have an in service data event recorder. This condition required the train speed to be maintained at or under 30 mph. Accordingly, the train was exceeding the speed authorized under federal law. Plaintiffs acknowledge that the court has ruled against them on this issue in the Order granting summary judgment, but wish to preserve the issue.

(2) In addition to prior evidence submitted to the court, it appears that the data event recorder did not record throttle function. This is a mandatory recording function and should provide the court reason to revisit the restricted speed issue.

(3) The train failed to slow and/or brake in sufficient time to avoid the collision.

(4) The train also failed to slow or to prepare for braking despite the existence of known specific local hazards. These hazards include all the conditions and practices created by Defendant railroad as identified herein. Plaintiffs acknowledge that the court has ruled against them on this issue in the Order granting summary judgment, but wish to preserve the issue. In the event additional "conditions" are revealed during discovery plaintiffs may wish to revisit the "local hazard" issue in view of the additional evidence.

(5) Defendant railroad failed to issue an appropriate slow order. Plaintiffs acknowledge that the court has ruled against them on this issue in the Order granting summary judgment, but wish to preserve the issue. In the event additional "conditions" are revealed during discovery plaintiffs may wish to revisit the "slow order" issue in view of the additional evidence.

### E. As to the ultra-hazardous crossing:

(1) The railroad crossing where this accident occurred is an ultra-hazardous or unreasonably dangerous crossing. Defendant railroad knew, or should have known, the ultra-hazardous nature of this crossing. This ultra-hazardous or unreasonably dangerous crossing is a railroad crossing that meets the conditions of 23 C.F.R. 646.214(b)(3); and therefore requires the installation of adequate warning devices including lights and gates.

(2) It appears that federal safety funds were used at this crossing to install one crossbuck. The use of federal funds at this ultra-hazardous crossing without bringing the crossing into compliance with 23 C.F.R. 646.214 constitutes a violation of the MUTCD, Arkansas law and the contract Defendant railroad had with the State of Arkansas. Those funds were wrongfully used in violation of 23 U.S.C. 109(e); 23 U.S.C. 139(d); 45 U.S.C. 434; and 23 C.F.R. 646.214.

(3) Knowing the requirements of Arkansas law and 23 C.F.R. 646.214, Defendant railroad elected to voluntarily engage in the evaluation of crossings for the expenditure of federal Rinds. The State of Arkansas relied upon Defendant railroad to perform a proper evaluation of crossings and make appropriate reports of crossing conditions. Instead of fulfilling these duties, Defendant railroad has routinely misreported and ignored safety problems of crossings. In keeping with its own pattern and practice Defendant railroad did not make appropriate reports of known hazardous conditions at the crossing where plaintiffs' accident occurred.

(4) Defendant railroad misreported or ignored the true nature of this crossing and others in the immediate vicinity, thereby adversely effecting the prospect of funding for installation of adequate warning devices.

(5) Defendant railroad has elected to totally ignore its joint obligations concerning crossing safety by failing to evaluate the crossing and work with local road authorities to improve the safety of the crossing. Instead, Defendant railroad has taken an adversarial position requiring local road authorities to fight against the railroad to obtain public safety accommodation Defendant railroad has elected to ignore the specific local hazards of small towns with limited resources and only cooperate with larger cities that have the power and resources to do battle with Defendant railroad.

(6) Defendant railroad has intentionally refused to evaluate grade crossings to provide reasonable information necessary to establish the need for additional warning devices. Instead. Defendant railroad's efforts to obtain public funding are directed by the motivation of increasing profits, supplementing its own maintenance budget and creating the affirmative defenses of federal preemption, all at the cost of public safety.

(7) Defendants have instructed railroad employees, the public and transportation officials in such a manner as to create a belief that the railroad has absolutely no duty to provide safe and adequate crossings for the motoring public.

(8) Defendants have known for years that lights and gates are affordable, cost effective guarding devices that have proven to be 90% effective in reducing accidents at grade crossings. Despite this knowledge Defendants have intentionally misrepresented the effectiveness of

7

these guarding devices and have engaged in conduct designed to limit the installation of these devices. The culture created by the Defendants' crossing safety policies has the effect of increasing risk to the motoring public.

(6) Plaintiffs acknowledge that the court has ruled against them on the lights and gates issues in the Order granting summary judgment. Plaintiffs wish to preserve these issues and proceed on all other theories pleaded herein.

## VIOLATION OF REGULATIONS AND RAILROAD RULES

4. The following regulatory provisions establish minimum requirements for operations and practices of defendant railroads at all times relevant herein:

(a) Title 49 of the Code of Federal Regulations, Part 217; governing railroad operation rules,

(b) Title 49 of the Code of Federal Regulations, Part 218; governing railroad operation practices,

(c) Title 49 of the Code of Federal Regulations, Part 220; governing railroad radio standards and procedures,

(d) Title 49 of the Code of Federal Regulations, Part 225; governing railroad accident investigations and reporting,

(e) Title 49 of the Code of Federal Regulations, Part 228; governing railroad employee's hours of service,

(f) Title 49 of the Code of Federal Regulations, Part 229; governing railroad locomotive safety standards,

(g) Title 49 of the Code of Federal Regulations, Part 233; governing railroad signal systems reporting requirements,

(h) Title 49 of the Code of Federal Regulations, Part 234; governing railroad grade crossing signal system safety,

(i) Title 49 of the Code of Federal Regulations, Part 236; governing railroad rules, standards and instructions for installation, inspection, maintenance and repair of systems, devices and appliances,

(j) Title 23 of the Code of Federal Regulations, Part 646; governing railroad-highway crossings projects, and

(k) Other related provisions in the Code of Federal Regulations, and in addition thereto

 (l) The enabling legislation for each of the above regulations.

 5. Pursuant to the above regulations defendant railroad has adopted rules governing its own practices and operations. The following rules, adopted by defendant railroad, must meet the minimum requirements of the federal regulations mandating their adoption but may prescribe additional or more stringent requirements:

  (a) Train Dispatcher Rules,
  (b) General Code of Operating Rules,
  (c) Radio Rules,
  (d) Safety Rules,
  (e) Air Brake and Train Handling Rules,
  (f) Maintenance-of-way Rules,
  (g) Timetables,
  (h) Special instructions, and
  (i) Other Rules, Orders and Instructions.

 6. Defendant railroad has violated the above rules and regulations governing their own practices and operations. Violation of its own rules and federal regulations are evidence of negligent, willful and wanton conduct.

### Operation Lifesaver

 7. The "Operation Lifesaver" campaign is a public relations program created by the Union Pacific Railroad in 1972. The program was incorporated in 1986 to serve the following special interests of the railroad:

(a) To deny and minimize the railroad's responsibility for crossing accidents,
(b) To blame the motorist for virtually all crossing accidents,
(c) To disseminate facts and misleading information about the effectiveness of lights and gates as crossing protection devices,
(d) To disseminate false and misleading information about the railroad's public safety responsibilities at railroad crossings,
(e) To indoctrinate railroad employees with a belief system that wrongfully incorporates the above mentioned misrepresentation into railroad culture pitted against the average motorists and oblivious to public safety issues at railroad crossings,
(f) To influence police with false and misleading information that serves only the special interest of the railroad industry,
(g) To influence government agencies and employees with false and misleading information that serves only the special interest of the railroad industry,
(h) To stereotype motorists involved in crossing accidents as unreasonable risk taking drivers and promote the concept that the railroads are victims of these accidents,
(i) To influence the media with false and misleading information that serves only the special interest of the railroad industry, and
(j) To actively influence the police and media response to individual crossing accidents.

8. Operation Lifesaver, Inc. has been fraudulently and wrongfully incorporated as a 501(c)(3), "non-profit" corporation designed to serve all the above referenced special interests of the railroad industry, including defendant railroad. In violation of its tax exempt status, OLI together with defendant railroad have done the following:

(a) Misrepresented this railroad public relations campaign as a safety and education program,
(b) Attempted to obscure the fact that Operation Lifesaver is a railroad program by misrepresenting it as a grassroots safety program,

10

(c) Wrongfully obtained tax free donations and federal funds to serve the special interests of the railroad industry, including defendant railroad,

(d) Wrongfully used OLI's tax exempt status to lobby for the special interests of the railroad industry, and

(e) Wrongfully used OLI's tax exempt status to influence the media, law enforcement, government agencies and government employees.

9. Defendant railroad has utilized OLI to provide false and misleading information to plaintiff, railroad employees, the public, governmental agencies and governmental employees, all of whose reliance on the information contributed to the accident and injuries in this case.

10. Since its incorporation in August of 1986, Operation Lifesaver, Inc. has actively targeted the public and the transportation industry with a long-term advertising campaign that continues to this date. Operation Lifesaver and the Union Pacific Railroad have jointly participated in this campaign for the purpose of shaping opinions and behavior. The long-term campaign has been successful in shaping the opinion of government employees, motorists and railroad employees.

11. The substance of this campaign is contained in Operation Lifesaver videos, newsletters, handouts, manuals and program materials. Some of those documents have been itemized in a list attached as Exhibit 2 to the Affidavit of Leila Osina. [The Affidavit of Leila Osina was incorporated into Plaintiff's Motion to file this Amended complaint.] That list of documents is incorporated herein to

identify for defendants the source of the misrepresentations contained in their campaign. The substance of these misrepresentations has been outlined above, in paragraph #7. A sampling of those misrepresentations has been attached hereto as Appendix 6 to The Affidavit of Leila Osina. Those documents are incorporated herein to identify for defendants the actual content of the misrepresentations contained in their campaign.

12. Defendants know or should know the number of times this program has been "presented," the number of videos they have distributed and the extent to which this packaged information has been disseminated through other forms of media and communications. Plaintiffs will be better suited to define the scope of these communications after discovery of that information from defendants

### Violation of Second Restatement of Torts § 324A.

13. Defendants have gratuitously taken upon themselves the joint dissemination of information related to railroad crossing safety. The nature and extent of the communications are outlined above, in paragraphs #7-12. These communications and misrepresentations actually began before Operation Lifesaver was incorporated. At that time the public relations department of the Union Pacific Railroad directed the communications and misrepresentations. Upon its incorporation in 1986, OLI began participation in this joint campaign.

14. These representations were made without regard to the exercise of reasonable care by the defendants and with the intention of having others rely upon the representations. Said misrepresentations include the following:

- (a) Misrepresentations concerning the effectiveness of lights and gates for the purpose of inhibiting the rate of installation of these safety devices.

- (b) Misrepresentations concerning the costs of lights and gates for the purpose of justifying the high costs being charged by Class 1 railroads and thereby the number of installations that could be accomplished under the limited federal funding program.

- (c) Misrepresentations concerning the responsibility for installation of lights and gates for the purpose of justifying the railroad industry's election to not independently upgrade railroad crossings.

- (d) Misrepresentations concerning the railroads' duties at grade crossing intended to make employees focus their attention on moving freight rather than public safety.

- (e) Misrepresentations concerning the causes of accidents intended to make employees, law enforcement and the media focus their attention on the motorist as the cause for accidents and obscure the railroads' responsibilities.

- (f) Misrepresentations following specific accidents to the media for the purpose of creating a public image that only risk takers and foolish drivers are involved in crossing accidents, and to portray an image that the railroad did nothing wrong.

- (g) Misrepresentations following specific accidents to the media for the purpose of covering up railroad wrongdoing.

- (h) Misrepresentations concerning the relative safety of fast train speeds

13

for the purpose of inducing the approval of high train speeds without commensurate crossing safety measures.

15. These representations resulted in an increased risk of harm to plaintiffs and was a substantial factor contributing to the accident in this case. Frank Stevenson, Union Pacific employees and government officials all relied in varying degrees on the information and message content from this orchestrated public information campaign.

 (a) Acting in reliance on this campaign and consistent with the culture it created, the maintenance of way crew for the railroad repaired and improved the track in question for higher speed trains and ignored the basics of crossing safety. This practice was consistent with the pattern of ignoring all crossings in the corridor from a public safety perspective while upgrading the track structure to accommodate higher train speeds.

 (b) Acting in reliance on this campaign and consistent with the culture it created, the train crew in question and all train crews for years prior had approached the crossing in question and all others in the corridor without regard to the dangerous conditions that should have been reported and remedied long before this accident.

 (c) Acting in reliance on the perceptions created by this campaign and consistent with the image he had developed concerning crossing, Frank Stevenson cautiously approached the crossing while keeping a reasonable lookout and listening for a train, only to be struck by a train that he could not hear or see until it was too late to avoid an accident.

 (d) Acting in reliance on this campaign and consistent its message state officials did not review the crossing in question for the need to install lights and gates which would have been installed long before this accident.

(e) Acting in reliance on this campaign and consistent its message no interested party requested a review of this corridor or this crossing, despite the fact that a review would have resulted in an upgrade to include lights and gates long before this accident.

16. Defendants' election to delay and inhibit the federal funding of lights and gates installations has resulted in a reduced number of guarded crossings being funded, and prevented the upgrading of the crossing in question prior to the accident.

17. Defendants have gratuitously taken upon themselves the dissemination of false and misleading information to the public, railroad employees and government officials, all as more specifically set forth herein. These representations have created a railroad culture that jeopardizes crossing safety and creates a false set of expectancies in reasonable motorists; all resulting in an increased risk of harm to plaintiffs.

## Fraud and Deceit

18. Defendant railroad and OLI have falsely represented facts more specifically described above in paragraphs #7-17. Defendants made these misrepresentations as a part of their public relations campaign knowing that these representations are false and misleading. If defendants did not have actual knowledge of the false nature of the representations, they lacked a sufficient basis of information to make the representations. By their actions, defendants have

sought to include reliance by the public, railroad employees and government employees. Reliance by those target audiences upon these false and misleading representations has contributed to the existence of unsafe condition and lack of safety devices at this crossing and other crossings in Arkansas. This campaign has resulted in the reduction in the number of lights and gates installations in Arkansas, In particular, the crossing in this case would have had lights and gates prior to this accident but for defendants' interference with the federal safety program funding those installations. Those lights and gates would have prevented this accident. Additionally, these misrepresentations and the associated public relations campaign caused or contributed to the basic safety deficiencies existing at this crossing. Those basic safety deficiencies contributed substantially to this accident.

19.   OLI has received federal funds to promote railroad crossing education and safety. These funds have been misused to promote the special interest of railroads and to lobby for railroad interests. OLI has fraudulently obtained nonprofit status to promote and lobby for railroad interests. Despite its joint participation with the railroad and its agenda of promoting railroad special interest, OLI has held itself out to railroad employees, the public, the media and government officials as an independent safety organization for the purpose of inducing reliance on its message. Defendants' have jointly used federal funds and

the tax-exempt status of Operation Lifesaver, Inc. to disseminate the misrepresentations described above.

20. In addition to information disseminated through the Operation Lifesaver program, defendant railroad has falsely represented facts to the Federal Railroad Administration. If defendant railroad did not have actual knowledge of the false nature of the representations, it lacked a sufficient basis of information to make the representations. Those misrepresentations include the following:

(a) There is a routine practice at this crossing of train crews not blowing the proper horn sequence as they approach the crossing. This routine practice is in keeping with the routine practice for all crossings in the immediate vicinity. This routine practice is known to the railroad, but the railroad has chosen not to monitor, report or punish horn violations. Instead of monitoring these violations and reporting them as required by federal law, the railroad has elected to falsely report compliance with horn rules. The railroad's failure to monitor, report or punish horn violations constitutes acceptance of the routine practice. The choice to falsely report compliance has contributed to the unsafe conditions at this crossing and the failure to implement basic safety requirements.

(b) The railroad is required to report visibility obstructions at crossings. Defendant railroad refuses to report such obstructions. Federal law requires reports of any visibility obstructions following crossing accidents. However, defendant railroad has implemented a routine practice of misrepresenting visibility obstructions in the mandatory reports following crossing accidents. In keeping with the routine practice visibility obstructions were not reported at this crossing despite knowledge of their existence prior to this accident and despite the occurrence of accidents at this crossing prior to the one in question.

The railroad intends for the public, railroad employees and government employees to rely on the falsely represented facts mentioned above. In fact, the information that is provided as required by federal law is the only source of obtaining such information from the railroad. Defendant intends for state and federal employees, the public and railroad employees to rely on the information, and intends to induce their actions or failure to act based upon such information. In justifiable reliance on this false information, state and federal employees, the public and railroad employees have not taken any action to correct or compensate for the safety deficiencies that exist at the subject crossing. That failure to act caused or substantially contributed to the accident in this case.

21.  Prior accidents, near misses, obstructed visibility, horn violations and prior complaints at this crossing and those in the immediate vicinity should have triggered a review of this crossing and the correction of safety deficiencies at the crossing. However, the railroad's intentional misrepresentation of crossing conditions and operating practices, concealment of other relevant information about safety problems and obscuring the truth about accident causation have all combined to prevent this crossing from getting basic safety improvements to bring it into compliance with minimum guidelines. These factors also prevented the crossing from being upgraded to lights and gates in a timely manner. Defendant

railroad has knowing elected to ignore, misrepresent and conceal these basic safety needs as a part of a plan to cut operating and maintenance costs.

### Spoliation of Evidence

22. Defendant railroad has engaged in a pattern and practice of hiding and destroying evidence with the intent of preventing its use in litigation. In keeping with its pattern and practice, defendant railroad has destroyed relevant evidence in this case and obstructed plaintiffs' access to other relevant evidence. The railroad's destruction and obstruction of access to relevant evidence has prevented plaintiffs from access to a lull and fair trial based upon the complete truth.

23. This pattern and practice of concealing and destroying evidence existed prior to this accident and resulted in the concealment of relevant safety data from the public and officials who would have used the information to improve the safety of the this crossing before this accident happened.

### Punitive Damages

24. Punitive damages should be assessed against the Defendants, in an amount to be fixed by the jury, for intentional, willful, wanton conduct, and reckless disregard for the safety of the public.

WHEREFORE, Plaintiffs pray that in addition to their claims for compensatory damages set out in their original complaint, that Defendants be

punished for their willful and wanton conduct, and reckless disregard for the safety of the public, by the assessment of punitive damages in an amount to be set by the jury; and for all other proper relief.

EASLEY, HICKY & HUDSON
Attorneys for Plaintiffs

By: _____
B. Michael Easley (74041)
Post Office Box 1115
Forrest City, Arkansas 72336-1115
(870) 633-1447

## CERTIFICATE OF SERVICE

I, B. MICHAEL EASLEY, attorney for the Plaintiffs in this cause, do hereby certify that I have served a copy of the above and foregoing pleading upon Mr. Scott H. Tucker, Attorney at Law, at his address at 2000 Regions Center, 400 West Capitol Avenue, Little Rock, AR 72201-3493 by posting a copy via regular U.S. Mail with sufficient postage thereon this 8th day of January, 2001.

_____
B. MICHAEL EASLEY